UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Stephony Beckman,                                       Civil No. 16-3124 (FLN)

           Plaintiff,                          **ORDER**

    v.

Nancy A. Berryhill,
Acting Commissioner of Social Security,

           Defendant.

___

Edward C. Olson, Attorney, for Plaintiff
Pamela Marentett, Assistant U.S. Attorney, for Defendant

___

Plaintiff Stephoney Beckman seeks judicial review of the final decision of the Commissioner of the Social Security Administration, who denied her application for disability insurance benefits under Title II and Title XVI of the Social Security Act. *See* 42 U.S.C. §1382(c). This Court has jurisdiction over Plaintiff's claim pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), 28 U.S.C. § 636(c), and Federal Rule of Civil Procedure 73. *See* ECF No. 1. The parties submitted cross-motions for summary judgment. *See* ECF Nos. 11 and 14. For the reasons set forth below, the Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE.**

## I. INTRODUCTION

On April 5, 2013, Beckman filed an application for disability insurance benefits. Administrative Record [hereinafter "AR"] 167, ECF No. 10. Beckman alleges that she became disabled on June 19, 2013. *Id.* Beckman's application was denied initially and again on reconsideration. AR 102, 112. On January 5, 2015, an administrative hearing was held before

1

Administrative Law Judge ("ALJ") Roger Thomas. AR 11. On February 11, 2015, the ALJ denied Beckman's application for disability insurance benefits. AR 11–22. On July 18, 2016, the Appeals Council denied Beckman's request for review, rendering the ALJ's decision final for purposes of judicial review. AR 1–3; *see* 20 C.F.R. § 404.981. On September 19, 2016, Beckman commenced this civil action, seeking a reversal of the Commissioner's decision, or in the alternative, a remand for further proceedings. *See* ECF No. 1 at 3.

## II. FINDING OF FACTS

**A.   Background**

Beckman was born on September 19, 1966. AR 72, 87. For the purposes of disability insurance benefits, she is considered a younger individual. *See* 20 C.F.R. § 404.1563(c). Beckman claims that the following disabilities preclude her from securing and maintaining competitive employment: major depressive disorder; panic disorder; PTSD; somatoform disorder; fibromyalgia; inflammatory arthritis; obesity; and asthma. AR 13. Beckman does not allege any error regarding the ALJ's determinations of the above disabilities. The Court, therefore, adopts the ALJ's factual findings as to these impairments and does not reiterate them below. Beckman's past relevant work includes jobs as a day care assistant, accounts payable, bank teller, manager, substitute teacher, executive assistant, customer service representative, and receptionist. AR 275.

**B.   Medical Evidence**

**1. Physical Health Impairments**

On June 22, 2012, Beckman presented to David Caccarno, M.D., complaining of worsening joint pain and a history of rheumatoid arthritis. AR 363. Beckman reported taking methotrexate and celebrex to control joint pain, but the side effects of these medications

concerned her. *Id.* Specifically, Caccarno noted that Beckman found it more desirable to live with pain than to risk the side effects of taking medication. *Id.* Caccarno referred Beckman to a rheumatologist for further examination regarding her rheumatoid arthritis and recommended that Beckman begin daily anti-inflammatory drug treatments. *Id.*

On July 2, 2012, Wu Sou Pan, M.D., examined Beckman and found no evidence of inflammatory arthritis. AR 369. Wu opined that Beckman's anti-inflammatory medications were not helpful to Beckman's joint pain. *Id.* Wu also noted that fibromyalgia and somatic complaints were the likely cause of Beckman's ongoing pain. AR 370. On July 9, 2012, Beckman presented to Erica Rodell, M.D., and she reported frustration with Wu's findings—noting her inability to attend work for the last two weeks due to her pain levels. AR 377. Rodell provided Beckman with an excused absence work letter for the next three weeks, in hopes that she would receive treatment from a rheumatologist. *Id.*

On July 13, 2013, Beckman presented to Thomas Harkcom, M.D. AR 380. Harkcom diagnosed Beckman with seronegative polyarthritis with erosive changes that developed on minimal therapy as well as secondary fibromyalgia. AR 379. Predinsone and a pool therapy program were recommended as treatment. *Id.* A second excused from work letter was provided to Beckman, with further evaluation to be made after six weeks. AR 380.

On July 29, 2012, Beckman was reexamined by Rodell. AR 390. At this examination, Beckman noted her dissatisfaction with the progress she had made since her appointment with Harkcom and difficulty managing her pain. *Id.* Rodell noted Beckman's leave of absence from work and disability. *Id.*

On August 14, 2012, Beckman was examined by David Baram, M.D. AR 394. During this appointment, Baram noted Beckman's history of arthritis. *Id.* Baram also noted that

3

Beckman should consult with a rheumatologist to obtain a more effective treatment regimen. *Id.* On August 20, 2012, Beckman was reexamined by Harkcom. An EMG revealed low grade synovitis of the wrist. AR 398. Harkcom noted that Beckman showed good motion in her left hip and knee, and prescribed plaquenil to manage her joint symptoms. AR 400. Beckman also reported improved symptoms. AR 400.

During a visit in November 2012, Harkcom stated that the primary medical concern at that time was not Beckman's arthritis, but fibromyalgia. AR 406. During this visit, Beckman stated that she was unable to continue with pool therapy due to insurance issues. *See id*. Moreover, Beckman decided to cease medications due to a concern of adverse side effects. *Id*. When asked about returning to work, Beckman stated that she does not think that she can maintain employment. *See id.*

On January 25, 2013, Beckman was once again examined by Harkcom, and he discussed the importance of exercise—particularly pool therapy with Beckman. AR 409. At this visit, Beckman complained of chronic joint pain and poor life quality. AR 408. Harkcom noted that Beckman suffered from mild inflammatory arthritis, but the condition was minimal. AR 409.

On March 27, 2013, Beckman presented to Rodell for palpitations and respiratory tract infection. AR 412. Rodell noted that Beckman had refused to participate in pool therapy. *Id*. Three days later, Beckman was admitted to Woodwinds Hospital after passing out. AR 291. EKG, MRI, and MRA testing were conducted—no abnormalities were found. AR 292.

On April 10, 2013, Beckman presented to Mary McCauley, MS, LICSW, for a behavioral health evaluation. AR 419. McCauley noted Beckman's "pain disorder associated with a condition: fibromyalgia and arthritis." AR 420. During the evaluation, Beckman noted a history of depression, anxiety, and pain. *Id.*

In August 2013, Rodell noted that Beckman's rheumatologist and the medical and pain management clinic recommended that she gradually return to work over the next yeAR AR 483. Beckman stated that she "would like to get a second opinion from different rheumatologists and pain specialists so that they would approve her for disability." *Id*. Rodell informed Beckman that many people are able to work with fibromyalgia and rheumatoid arthritis, and that her mental health condition was likely the limiting factors to her recovery. *Id*.

On December 10, 2013, Beckman was taken to the Woodwinds Hospital Emergency Room after passing out again, however, no abnormalities were found. AR 651. On January 9 2014, Beckman received injections in her spine and a radio-frequency ablation. AR 574. Andrew Schakel, M.D., treated Beckman with methotrexate. AR 568. Schakel noted some swelling; however "there [were] no other swollen joints, upper or lower extremities." *Id*.

In mid-2014, Beckman began attending physical therapy at Courage Kenny Sports and Physical Therapy – Cottage Grove, in Cottage Grove, Minnesota. AR 626. On July 24, 2014, Beckman's physical therapist noted that Beckman had been "doing a lot of packing which makes her body sore, especially her feet and back." AR 627. The following weekend, Beckman held a yard sale—which left her "emotionally and physically exhausted." AR 633.

### 2. Mental Health Impairments

On August 14, 2012, Beckman presented to Minnesota Mental Health Clinics, where she was diagnosed with an adjustment disorder with mixed anxiety and depressed mood. AR 285. At the appointment, Beckman's mood and affect were described as calm and she scored a 60 on the Global Assessment of Functioning test—indicating moderate symptoms. AR 285–86.

In March 2013, Rodell noted mental Beckman's mental health issues and discussed with Beckman her concerns regarding her mental state. AR 412. Furthermore, Rodell noted that

Beckman claims that she is often unable to leave her bed and wishes that "she simply would not wake up." AR 411–12.

In April 2013, Beckman began psychotherapy sessions with McCauley. AR 415. McCauley's initial diagnose was pain disorder associated with fibromyalgia and arthritis. AR 419. During this appointment, Beckman's mood was described as "depressed and worried" and she scored a 50 on the Global Assessment of Functioning test. *Id*. On May 6, 2013, Beckman returned to McCauley for further treatment. AR 439. McCauley noted that Beckman's mood was improved and her speech, eye contact, and thought process were within normal limits. *Id*. Further, Beckman informed McCauley that she had "turned a corner" in her recovery and had recently accepted a position on a committee for a non-profit group. *Id.* Beckman estimated that position would consume "a couple hours a month, and she can start and stop tasks as needed." *Id*.

On May 17, 2013, Beckman presented to Dr. Gay Bartholic. AR 449. Bartholic diagnosed and prescribed medication for depression and anxiety. *Id.* A Global Assessment of Functioning score of 52, indicative of moderate symptomatology, was assessed. AR 450.

Beckman returned to Bartholic on August 8, 2013. AR 484. Beckman had restarted Zoloft and Cymbalta treatments two days prior to this visit. *Id*. During this visit, Beckman reported "a significant increase in depression since stopping her medication several months ago." AR 485. Additionally, Beckman reported increased stress as a result of caring for her sister's children. *Id*. Bartholic assessed a "remarkable increase in depressive symptoms following stopping . . . Zoloft and Cymbalta [treatments]." *Id.*

On September 9, 2013, Beckman presented Raymond Kennedy, M.D., at the recommendation of Bartholic. AR 477. Kennedy noted Beckman's attitude as "moderately to severely depressed." AR 478. Kennedy also noted that her physical appearance as "normal

6

muscle strength, tone, gait, and station" in addition to being "quite tearful during [the] interview process." *Id.* Also in his report, Kennedy noted that Beckman "tends to put all of her effort into caring for others or her job and less time for herself." AR 477. A Global Assessment of Functioning test was assessed and Beckman scored 50 to 55. AR 478.

On October 24, 2013, Beckman presented to McCauley for an individual therapy session. AR 496. McCauley noted that Beckman was dismissed from intensive outpatient care with Kennedy and the mind-body skills group in May 2013 for tardiness and absences. *Id.* McCauley noted that Beckman was unable to take care of herself because she was taking care of too many other people. AR 497.

On November 7, 2013, McCauley noted Beckman's resentment towards her doctors that would not support her being off work on disability or her application for disability benefits. AR 504. McCauley diagnosed somatic symptom disorder severe and major depression. *Id.* Additionally, the notes for this visit express concern for Beckman's habit of overextending herself during the day then staying in bed too long in the evenings and weekends. AR 505.

During a November 20, 2013 visit, McCauley noted that Beckman "has no balance now: works non-stop all day, then goes to bed exhausted[,]" and was not eating. AR 518. Beckman stated that this routine would cease when her nephews that she was caring for returned home to their mother, though there seemed to be some confusion on when that would occur. AR 518–19.

On December 13, 2013, while in Bartholic's office, Beckman was "laying on floor and sobbing . . . . S[tating that] she wants to die and cannot live like this anymore." AR 529. Beckman refused admission to Regions Hospital despite Bartholic's recommendation. AR 530. Eventually, Beckman voluntarily went to United Hospital with her husband. *Id.* Bartholic noted Beckman was "Quite angry about needing to go to ER." AR 530. Beckman later stated that she

7

would not consider inpatient therapy in the future as "that would break [her]." AR 533. Beckman then asked for – and received – a work note, which she claimed was needed for her employer to hold her position. *Id.* Beckman continued treating with McCaluey throughout 2014. On January 7, 2014, Beckman was diagnosed with somatic symptom disorder; borderline personality disorder; major depression, severe; and PTSD. AR 536.

On January 22, 2014, Beckman reported to Timothy Gendron, M.D., as she felt "betrayed" by Bartholic after she attempted to put Beckman on a psychiatric hold. AR 542. Here, Beckman scored 27/27 on the PHQ-9 test, indicating severe depression. AR 542.

At a March 4, 2014, appointment with McCauley, Beckman reported that she cleaned her home excessively, but was unable to bathe. AR 558. Beckman reported going out with her husband "but feeling overwhelmingly anxious around others." AR 558. Additionally, Beckman reported that "she's been too busy taking care of her health" to make an appointment for Dialectical Behavior Therapy ("DBT"), as was recommended by her doctors. AR 559. Next, Beckman reported that, despite her "debilitating anxiety in public" she would be going on a cruise in May 2014 and, thus, could not begin DBT until after she returned. *Id.* At the end of the meeting, Beckman requested a letter for her employer indicating she is in therapy. *Id.* McCauley declined to provide such a letter because Beckman is not active in therapy. *See id.*

One week later at an appointment with Gendron, Beckman again asked for a work letter, but had difficulty explaining why she needed it. AR 563. In response, Beckman stated it was "to cover [her] bases." *Id.* Gendron requested that she return to her employer and get information on why her employer specifically needed such a letter. *Id.* Gendron had reviewed McCauley's notes from her March 4, 2014, appointment with Beckman, noticing that she had also requested a similar letter from McCauley. AR 564. Despite the tone of this conversation being "very calm,"

Beckman was offended by Gendron's refusal to write her a work note on the spot, stating that "she feels she needs to get all new doctors and treatment . . . outside of HealthPartners." *Id.*

On April 15, 2014, Beckman began DBT at Mental Health Systems, where she was diagnosed with major depression, recurrent; panic disorder; and PTSD. AR 711–754. Beckman scored a 50 on the Global Assessment of Functioning test. AR 754; AR 441. The report states that Beckman's goals were to return to ministry, return to working for a nonprofit organization, run an organization again, and enjoy time with her family. AR 753.

In May 2014, Beckman reported that she was able to take daily walks with her husband for thirty minutes at a time. AR 615. In August 2014, Beckman was able to host a yard sale. AR 633. She was apparently feeling better emotionally at this time. *Id.* On September 24, 2014, Beckman reported she would be leaving town for a vacation that involved speaking engagements. AR 719. Beckman was also able to participate in family activities – including attending a couple movies – while in New Jersey for the speaking arrangement. *Id.*

On December 17, 2014, Beckman's psychologist, Dr. Laura Accomondo, opined that she lacked the ability to perform certain vocational functions and had marked limitations in others. AR 707–10. Accomando assessed marked and extreme limitations in Beckman's activities of daily living, social functioning and concentration, and persistence or pace with multiple episodes of decompensation. *Id.* Accomando opined that Beckman would be absent more than three days a month from work. AR 710.

### C.     Vocational Expert Testimony

At the January 5, 2015, hearing, the ALJ posed a series of questions to vocational expert Kenneth Ogren. Ogren testified that Beckman could not perform her past work. Ogren testified that Beckman's limitations were too severe to perform any of her past work because it was

"semi-skilled to rather skilled" and involved dealing with the public. AR 67. Ogren testified that Beckman could, however, work as a polisher, inspector, and stuffer. AR 68. The ALJ then posed this hypothetical:

> [i]f I were to change these limitations to that of another evaluator, that she is limited, essentially, to routine, repetitive three to four-step; and limited detailed instructions; superficial contacts with the supervisors and members of the public or no more than ordinary supervision would be required; and no more than routine changes, would that change your testimony as to the jobs you've just mentioned?

AR 68. To which Ogren replied "No." AR 69. Finally, the ALJ referenced Accomando's vocational evaluation, and asked Ogren whether someone with the same limitations could perform the jobs listed. *Id.* Ogren replied that someone with the listed limitations referenced could perform "no jobs." *Id.*

**D.   The Commissioner's Decision**

In determining that Beckman was not disabled, the ALJ followed the five step sequential process outlined by 20 C.F.R. § 404.1520.

The first step in the sequential analysis is whether Beckman has engaged in substantial gainful activity ("SGA"). *See* 20 § C.F.R. 404.1520(b). If Beckman had performed SGA since the alleged onset date of disability, she is not disabled. *Id.* The ALJ found that Beckman had engaged in substantial gainful activity during the fourth quarter of 2012, when she earned $4,305, and in the fourth quarter of 2013, when she earned $3,150. AR 14. Beckman testified she had not worked since June 19, 2012, and that those earnings were not the result of SGA, but rather commission checks and sick pay. *Id.* The ALJ noted that, if true, Beckman's contention would mean there was no SGA since the alleged onset date. Nonetheless, the ALJ determined that there had been a twelve-month period of non-activity and chose to address that period for the remainder of his analysis. *Id.*

The second step required the ALJ to determine whether Beckman has a severe, medically determinable impairment or combination of impairments. *See* 20 C.F.R. § 404.1520(c). For the purposes of satisfying the regulations, "severe" impairments are those that significantly limit an individual's ability to perform basic work activities. 20 C.F.R. § 404.1509. If the ALJ determines that Beckman does not have a severe medically determinable impairment, she is not disabled. *See* 20 C.F.R. § 404.1509. After examining Beckman's medical records and testimony, the ALJ determined that Beckman had the following severe impairments: major depressive disorder; panic disorder; PTSD; somatoform disorder; fibromyalgia; inflammatory arthritis; obesity; and asthma. *See* 20 C.F.R. § 404.1520(c). The ALJ found that the combination of Beckman's impairments interferes with her ability to perform basic work functions. AR 14.

The third step of the sequential analysis asks whether Beckman's impairments meet or medically equal one of the criteria of an impairment listed in 20 C.F.R. § Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526. The ALJ determined that Beckman's impairments did not satisfy the Appendix 1 criteria. *Id.* In making this determination, the ALJ considered both "paragraph B" and "paragraph C" criteria, but determined that Beckman did not meet these requirements. *Id.*

Given that Beckman's impairments failed to satisfy the Appendix 1 listings, the ALJ must assess Beckman's Residual Functional Capacity ("RFC"). An individual's RFC is her ability to perform physical and mental work activities on a sustained basis despite limitations from her impairments. All of Beckman's impairments – not only those that are severe – must be taken into consideration by the ALJ when making this assessment. *See* 20 C.F.R. §§ 404.1520(e), 404.1545. The ALJ determined that Beckman has the following RFC:

> to perform light work as defined in 20 C.F.R. 404.1567(b) (lift/carry, push/pull up to 20 pounds occasionally and 10 pounds frequently; sit for about 6 hours and

> stand/walk for about 6 hours in an 8-hour workday) except Beckman is precluded from extremes or high concentrations of dusts, fumes, gases or the like. She is limited to unskilled to semi-skilled tasks, with brief and superficial contact with others, where working with the public is not a primary task.

AR 15. In making his determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as opinion evidence. AR 16. While the ALJ agreed that Beckman's medically determinable impairments could be reasonably expected to cause the symptoms experienced, the ALJ determined that Beckman's statements on the intensity, persistence, and limiting effects of the symptoms to be non-credible and incompatible with the objective medical evidence. AR 17.

Also in making his RFC determination, the ALJ considered the testimony of independent medical expert Dr. Karen Butler, whose testimony indicates that Beckman was "limited to unskilled through semi-skilled work, with brief and superficial contact with others, in a job where serving the public was not a primary task." AR 18. The ALJ gave "great weight" to this portion of Butler's testimony because he believed it was based on Butler's careful review of Beckman's objective medical records. AR 16.

However, the ALJ did not give weight to the portion of Butler's testimony wherein she stated that, due to scoring 50 on the Global Assessment of Functioning ("GAF") test, Beckman would have been unable to work full-time since April 10, 2013. AR 18. In choosing to not give this testimony weight, the ALJ noted inconsistencies in the record—particularly subsequent GAF scores in the 50s, indicative of moderate symptomatology, and Beckman's day-to-day activities during the time in question. *Id.* Finally, the ALJ believed that Butler erred by not factoring Beckman's credibility and secondary gain into her analysis. AR 19.

At step four of the sequential evaluation, an ALJ must determine whether the claimant can perform any of their past relevant work. *See* 20 C.F.R. § 404.1565. If Beckman has the requisite RFC to perform her past relevant work, she is not disabled. *See* 20 C.F.R. § 404.1520(f). Here, Because Beckman's RFC limits her to limited work with the public; the ALJ determined that she was unable to perform her past work. AR 21.

The fifth and final step of the sequential evaluation process requires the ALJ to determine whether Beckman has the RFC to perform any other jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(g). If Beckman is able to perform other work, she is not disabled. *See id.* Here, the ALJ found that there were other jobs that exist in significant numbers in the national economy that could accommodate Beckman's limitations, precluding a disability finding. AR 22. This decision was based on the vocational expert's testimony in response to the ALJ's hypothetical questions. *Id.*

### III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §(d)(1)(A). "An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means "more than a mere scintilla;" it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether the ALJ's decision is based on substantial evidence, court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Prosch*, 2021 F.3d at 1012 (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

A court, however, may not reverse merely because substantial evidence would have supported the alternative decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome… or because we would have decided the case differently." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). Therefore, the Court's review of the ALJ's factual determinations is deferential and the evidence is neither reweighed, nor the factual record reviewed *de novo*. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F. 3d 672, 675 (8th Cir. 1996).

## IV. ANALYSIS

Beckman argues that the ALJ erred by: (1) improperly discounting the opinions of her treating medical providers and the medical expert at the hearing, and substituting his own opinions for those of the medical professionals; and (2) improperly fashioning Beckman's RFC,

14

thereby making the testimony of the vocational expert inadequate for the purposes of satisfying the substantial evidence standard. *See generally* ECF No. 12. The Commissioner argues that the ALJ properly weighed the medical opinions of record, properly weighed Butler's medical testimony, and substantial evidence supports the ALJ's finding that Beckman was not disabled under the Social Security Act. *See id.* at 13. The Court agrees.

### A.     The ALJ Did Not Err in Fashioning Beckman's RFC

Beckman contends that the ALJ improperly weighed the medical evidence in determining her RFC. *See* generally ECF No. 12. Specifically, Beckman argues that the ALJ erred in weighing the opinions of Accomando and Butler. *See id.*

#### 1.    Substantial evidence supports the weight assigned to Accomando's opinion

A treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002); *see, e.g.*, *Strongson v. Barnhart*, 361 F.3d 1066, 1077 (8th Cir. 2004) (opining that an "ALJ should give more weight to the opinion of doctors who have treated a claimant regularly over a period of months or years because they have a longitudinal picture of [the] impairment.") (internal citation omitted).  Beckman contends that Accomando's December 17, 2014, opinion states that Beckman's impairments were severe and the limitations imposed by her impairments will cause her to miss several days of work per month. AR 707–10.

However, when a treating medical provider's opinions are inconsistent with the record as a whole, they are entitled to less weight. *See Krogmeier,* 294 F.3d at 1023. Here, the ALJ concluded that Accomando's opinion was inconsistent with the entire record. During the year prior to Accomando's report, Beckman had the physical and mental capacity to: provide care for

her two nephews and her many pets, clean her home excessively, plan a cruise, prepare for and host a yard sale, take daily walks with her husband for thirty minutes at a time, and travel to New Jersey, where she successfully engaged in public speaking and family activities taking place in public. AR 533, 558, 559, 704. Here, the ALJ properly concluded that Beckman's daily activities contradicted Accomando's report, which was inconsistent with the record as a whole.

Beckman asserts that the ALJ's rationale for discounting the opinion of Accomando "does not comport with the substantial evidence on the record as a whole' standard." ECF No. 12 at 13. However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). Here, Accomando's limitation findings were inconsistent with Beckman's daily activities and the assessments of her other physicians. Thus, substantial evidence supports the ALJ's discounting of Accomando's opinions.

### 2. Substantial evidence supports the weight assigned to Butler's opinion

Beckman argues that the ALJ erred in discounting Butler's medical testimony, specifically her testimony that Beckman would have difficulty working eight hours a day, five days a week as of April 10, 2013. *See* ECF No. 12 at 13. Butler relied on the GAF score of 50 – indicative of severe symptomatology – in making this determination. *See id.* However, the ALJ noted that Butler ignored subsequent administrations of the GAF test, which showed that Beckman had scored above 50 – indicative of only moderate symptomatology – as well as recommendations from Beckman's doctors that she gradually begin returning to work. AR 483. An ALJ "may reject the conclusions of any medical expert in a disability benefits claim

proceeding . . . if they are inconsistent with the record as a whole," *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (citing *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995)), and the ALJ here provided ample explanation for the weight provided to Butler's opinion.

Additionally, the Court notes that Butler did not examine Beckman. *See, e.g.*, *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) (reasoning that the weight given to "nonexamining sources . . . depends on the degree to which they provide supporting explanations."). Butler's opinion that Beckman "would have difficulty going eight hours a day, five days a week," relied solely on the GAF score from April 10, 2013, and failed to address subsequent improvements in Beckman's GAF. The ALJ properly discounted the opinion as Butler failed to adequately provide supporting explanations or the entire record. *See Lauer*, 245 F.3d at 705. Thus, there is substantial medical evidence supporting the ALJ's position, and this Court will not overturn the Commissioner when it finds: "[i]t is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings. Even if we would have weighed the evidence to differently . . . ." *Pearsall*, 274 F.3d at 1217.

### 3. Substantial evidence in the record supports the ALJ's RFC determination

While the RFC determination is inherently medical in nature, the ALJ makes the determination on "all the relevant medical and other evidence." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010); *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Beckman argues that because Butler provided her opinion having reviewed the whole record (including the many GAF scores and daily activities of Beckman), that the ALJ should be precluded from reaching a different conclusion. *See* ECF No. 12 at 14. This logic is misguided. Evidence considered by a medical expert does not confine the ALJ; rather, the ALJ is tasked with considering the consistency of the expert's

opinion when compared to the record on the whole. *See* 20 C.F.R. § 404.1527(c)(3)–(4). The ALJ uses six criteria when weighing medical opinions:

1. Whether or not an examination was conducted;
2. Whether and to what extent the expert treated Beckman;
3. Whether the opinion relies upon probative evidence and provides a persuasive rationale;
4. Whether the opinion is consistent with the record as a whole;
5. Whether the expert has a specialization; and
6. Whether any other relevant considerations apply.

*See* 20 C.F.R. § 416.927(c)(1)(6).

Here, substantial evidence supports the ALJ's application of these factors. Specifically, the ALJ considered the medical record as a whole and concluded that Butler's limitation findings were inconsistent with the record. In addition, the ALJ provided a persuasive rationale as to why Butler's testimony diverged from the bulk of the probative evidence in the record. Further, that Butler never examined Beckman favors the ALJ's weight assigned to Butler's testimony.

Moreover, the ALJ sufficiently analyzed Beckman's GAF scores and their correlation to the record as a whole in concluding that Beckman's daily activities and history of GAF scores above 50, taken as a whole, outweighed evidence suggestive of severe symptomatology. *See, e.g.*, *Conklin v. Astrue*, 360 F. App'x. 704, 707 (8th Cir. 2010)) (reasoning that GAF scores must be carefully evaluated when determining a claimants RFC). Fundamentally, an RFC is a medical question, and an ALJ's findings regarding RFC must be supported "by some medical evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). Here, the ALJ provided, at minimum, some evidence in support of his findings regarding Butler's testimony.

**B.     The ALJ Did Not Err in Applying the Vocational Expert's Testimony**

Vocational expert testimony in response to properly-phrased hypothetical questions constitutes substantial evidence to deny disability benefits. *See Roe v. Chater*, 92 F.3d 672, 675

(8th Cir. 1996); *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996); *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993) (per curiam). Beckman argues that because the ALJ's RFC determination was incorrect, the vocational expert's testimony cannot constitute substantial evidence on which to deny benefits. *See generally* ECF No. 12. Moreover, Beckman asserts that "[u]nless the hypothetical question comprehensively describes the limitations on Beckman's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist . . . ." AR 17; (quoting *Smith v. Shala*, 31 F.3d 715, 717 (8th Cir. 1994)). At the hearing, the ALJ asked the vocational expert the following hypothetical:

> If I were to change these limitations to that of another evaluator, that she is limited, essentially, to routine, repetitive three to four-step; and limited detailed instructions; superficial contacts with the supervisors and members of the public or no more than ordinary supervision would be required; and no more than routine changes, would that change your testimony as to the jobs you've just mentioned?

AR 68. Beckman fails to point to which limitation she believes was erroneously excluded from the ALJ's hypothetical question. And even if she had pointed to a set of limitations (for example, Accomando's), the ALJ's hypothetical question need only include "those impairments that the ALJ finds are substantially supported by the record as a whole." *Cruze*, 85 F.3d at 1323 (internal citation omitted).

In making his RFC determination, the ALJ – supported by substantial evidence on the record as a whole – determined that the impairments assigned to Beckman by Accomando were not consistent with the record. Thus, the ALJ was not required to include such impairments in his hypothetical questioning. *See id*. at 1323. Because the limitations included in ALJ's hypothetical question were consistent with his earlier RFC determination, the hypothetical questions were properly phrased—thereby constituting substantial evidence on which to deny disability. *See id*.

## V. CONCLUSION AND ORDER

If the ALJ's decision is supported by substantial evidence in the record, this Court cannot reverse simply "because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468. Here, substantial evidence supports the ALJ's RFC determination that Beckwith could perform medium exertion work with certain restrictions, and that there are substantial jobs in the national economy Beckwith could perform.

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 11) is **DENIED**;

2. Defendant's Motion for Summary Judgment (ECF No. 14) is **GRANTED**;

3. The Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE.**

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March  22, 2018                                *s/Franklin L. Noel*
                                                                            FRANKLIN L. NOEL
                                                                            United States Magistrate Judge